UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No.: 20-251 (DWF/ECW)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **TRIAL BRIEF OF THE UNITED** |
| | ) | **STATES** |
| v. | ) | |
| | ) | |
| TY RAYMOND JINDRA, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys W. Anders Folk, Acting United States Attorney for the District of Minnesota, and Amber Brennan and Michelle Jones, Assistant United States Attorneys, respectfully submits its trial brief. Included in this brief is a summary of the facts the government expects the evidence will establish at trial, as well as briefing in support of the government's motions in limine and other evidentiary matters that may arise during trial.

## I.   SUMMARY OF ANTICIPATED TRIAL EVIDENCE

### *The Charges*

Defendant Ty Raymond Jindra is a former Minneapolis police officer who faces a multi-count indictment charging him with the following crimes: acquiring a controlled substance by deception (Counts 1-6), extortion under color of official right (Counts 7-8), and deprivation of rights under color of law (Counts 9-11).

*Jindra's Background Within the MPD*

Jindra joined the Minneapolis Police Department ("MPD") in February 2013 as a Community Service Officer ("CSO"). CSOs are civilian employees who are in the process of becoming recruit officers. During CSO tenure, they work in various non-enforcement positions while completing their academic and other law enforcement requirements.

By the fall of 2014, Jindra had completed his educational requirements and MPD hired him as a police recruit. After passing the Minnesota Peace Officer Standards and Training ("POST") Exam, he became a sworn police officer with the MPD. In the five years between November 2014 and October 2019, Officer Jindra primarily worked the night shift patrolling the 4th and 5th precincts of Minneapolis, which generally cover the northwest and southwest corners of the city, respectively.[1] Typically, a patrol officer's duties are to respond to 9-1-1 calls and conduct proactive enforcement work such as traffic stops. For nine months between December 2017 and September 2018, Jindra was assigned to the Community Response Team ("CRT"), which is a mobile flexible force that is available for assignment in uniform or plain clothes within each precinct, depending on the precinct needs. CRT officers may be assigned to various duties including but not limited to enforcement concerning livability issues such as drug dealing and prostitution, surveillance, crowd control, and patrol in high crime or crime specific areas. Jindra returned to patrol after leaving the CRT. In March of 2019, Jindra underwent training to

---

[1] Jindra was usually assigned to either the "dogwatch" or "middlewatch" shifts. Dogwatch is 8:00 p.m. to 6:15 a.m. and middlewatch is from 3:30 p.m. to 1:30 a.m. "Daywatch" is from 6:00 a.m. to 3:30 p.m.

become a field training officer ("FTO").  FTOs are partnered with new officers to train and evaluate them on patrol during their first four months out of the academy.  Jindra was partnered with at least one new officer after completing his FTO training.

Minneapolis police officers wear body worn cameras ("BWCs"), which record their activities on duty.  Between late September and mid-October 2019, Jindra's supervisors began reviewing his BWC footage in response to complaints they had received regarding three then-recent incidents. On October 18, 2019, Jindra was placed on "Relieved of Duty" ("ROD") status - similar to a suspension with pay - due to their concerns about his conduct. In late October of 2019, the MPD referred the case to the Federal Bureau of Investigation ("FBI").

### The Offense Conduct

The investigation revealed that between at least September 2017 and October 2019, Jindra engaged in a scheme to obtain controlled substances during routine traffic stops and other encounters with citizens while on duty. Counts 1 through 6 of the Indictment are based on incidents in which Jindra used various means of deception in order to acquire illegal drugs for himself and conceal them from the MPD, including his partners and other first responders on scene.  Much of Jindra's conduct is captured on his own BWC footage, as well as the BWCs of other officers on scene.  In addition to the BWC videos, the United States expects to offer MPD reports, including CAPRS/PIMS and incident detail reports, and testimony from others who were present during the events at issue, including other officers present and civilian witnesses, to show Jindra's scheme.

As the evidence will show, Jindra employed many tactics to obtain drugs on the job.  Among them, he intentionally created opportunities to conduct searches outside the purview of other officers on scene so that he could find and/or conceal drugs without their knowledge: Sometimes he diverted his partners to other tasks so that he could find and/or conceal drugs seized, and other times he strategically waited until his partners were occupied with other tasks in order to conceal drugs he had found.  On several occasions, Jindra used latex gloves he wore during traffic stops to encase controlled substances that he had recovered so that he could transport and divert them to himself without his partner's knowledge. On some occasions, Jindra placed his drug-filled gloves in his personal duty bag in the cargo area of the squad car.  On others, he tucked them into his pocket or in the door of the squad car.

Jindra also used his status as an FTO to obtain possession of drugs that another officer had recovered at the scene of a stop.  For instance, on one occasion where his trainee discovered a container of oxycodone pills in a driver's sock, Jindra siphoned off a portion of the pills before he placed the rest of the pills and their container in evidence – all while his trainee was busy with legitimate police work related to that stop.  On another occasion, Jindra and his partner encountered a car containing four people in which it appeared the driver was injecting drugs into her arm and at least one person in the car was unresponsive and potentially overdosing.  Jindra took the driver aside, obtained three vials of heroin and methamphetamine that she was carrying, encased the drugs in his latex glove and placed them in his duty bag, all while his partner was dealing with other three individuals in the vehicle, one of whom was overdosing.  Jindra did not disclose to his

partner, other officers or the medics who arrived to assist that he had recovered methamphetamine and heroin from the driver. As part of his scheme, Jindra routinely misled his partners and violated various MPD policies by failing to report that he had recovered drugs or log them into evidence.

Counts 7 and 8 of the Indictment charge Jindra with extortion under color of law. The government expects the evidence to show that in those two instances, Jindra used his position as a Minneapolis police officer to induce citizens to "voluntarily" relinquish their drugs to him, by promising that he would not arrest them if they "were honest" or "told the truth" and gave up their drugs willingly.  Counts 7 and 8 are based on the same incidents as Counts 3 and 6, respectively, because while he extorted the victims to obtain their drugs, he was able to keep those drugs for himself by deceiving his partners on scene and the MPD about the recovery. The United States expects to rely on the same evidence applicable to Counts 3 and 6, including BWC footage, reports, and testimony of witnesses and victims present during the incidents.

The evidence at trial will also show that Jindra frequently conducted pat-downs and searches of vehicles and persons without the requisite reasonable suspicion or probable cause, presumably as part of his quest for drugs. Counts 9 through 11 charge Jindra with deprivation of rights under color of law based on three separate incidents in which he searched a citizen's vehicle without a lawful basis. The United States expects to present evidence of these civil rights violations through footage from the BWCs of Jindra and his partners, MPD reports from those incidents, as well as testimony from witnesses at the scene, including his former partner.

5

The United States also intends to present testimony from two witnesses who have firsthand knowledge of how police officers are trained related to fourth amendment protections. Rod Nelson, a lawyer and former Hennepin County Sheriff's deputy, taught the legal issues course that Jindra took at Hennepin Technical College in order to satisfy his Professional Police Officer Education requirement and qualify to take the Minnesota POST exam. Alan Harris, a former managing attorney with the Hennepin County Attorney's Office, provided search and seizure training for Jindra's class at the MPD police academy in September 2014. The testimony of these witnesses is relevant to show Jindra's knowledge about the parameters of a lawful seizure, as relevant to whether he "willfully" violated a known constitutional right in conducting the unlawful searches.  The United States disclosed both of these witness as experts in an abundance of caution, however their testimony is primarily as fact witnesses given that it will focus on what they taught Jindra and his contemporaries related to search and seizure issues.

*Events After MPD Learned of Jindra's Conduct*

As noted above, MPD began investigating Jindra after receiving complaints about his conduct in the fall of 2019.  On October 15, 2019, Jindra's supervisors met with him at the precinct to discuss their concerns about three incidents they had reviewed. The meeting was recorded. Jindra was not compelled to participate in the meeting as a condition of his employment.  On October 18, 2019, the MPD placed Jindra on ROD status.  After the meeting with his supervisors, but before he was placed on ROD status (which terminated his access to the MPD case management system), Jindra logged on to the system to add

6

new reports to two of the three incidents that had been discussed with him, in an apparent attempt to justify his conduct.

After Jindra was placed on ROD status, he filed a medical claim with MPD in which he claimed to have post-traumatic stress disorder as a result of being one of the first squads to respond to the high-profile, 2017 incident in which a Minneapolis police officer shot and killed a woman who had called 9-1-1 for help. Jindra also filed a complaint alleging that his sergeant and lieutenant had discriminated against him. Jindra has since engaged in other behavior to indicate that he believes he was treated unfairly by his supervisors and the MPD generally.

Jindra remained on ROD status until July 13, 2020, when the MPD terminated his employment for misconduct. Jindra's ultimate termination was based on a 2017 complaint in which the MPD found he had violated the MPD's policies on search and seizure, documentation of search and seizure (report writing), and professional policing. As set forth below, the government seeks to introduce evidence of this same 2017 complaint pursuant to Federal Rule of Evidence 404(b) for the purpose of showing that Jindra was on notice by at least May 2018 that his search practices were under scrutiny.

The government does not intend to offer evidence in its case in chief regarding disciplinary measures MPD took with respect to any complaint against Jindra, including any findings of misconduct or his ultimate termination, or the substance of any statement that Jindra made to the MPD regarding the complaints against him.

## II.   ANTICIPATED EVIDENTIARY AND LEGAL ISSUES DURING TRIAL

### A. Stipulations and Self-Authenticating Records

The majority of exhibits the government intends to offer are records maintained by either the MPD, the Minnesota Peace Officer Standards and Training (POST) Board, or Hennepin Technical College (HTC). The parties will work together in order to shorten the trial and obviate the need to call custodians of records or other nonessential foundation witnesses.

The POST Board and HTC exhibits are business records, and the government intends to seek a stipulation from the defense as to admissibility of these records pursuant to Rule 803(6) of the Federal Rules of Evidence. With respect to any business records for which Jindra is unwilling to stipulate as to foundation, the government has provided and will continue to provide notice to defense counsel of its intent to offer these business records without a records custodian pursuant to the self-authentication provisions of Federal Rules of Evidence 803(6) and 902(11). Federal Rule of Evidence 902(11) provides that certified domestic business records of regularly conducted activities can be self-authenticating and therefore admissible under Federal Rule of Evidence 803(6) if accompanied by a written declaration from a records custodian or other qualified person certifying that the records: (a) were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; (b) were kept in the course of a regularly conducted activity; and (c) were made as a regular practice by the regularly conducted activity.  The records and corresponding 902(11) declarations have been and will continue to be provided to defense.

The MPD records fall into two categories: (1) personnel records related to Jindra's hiring, training, and other matters concerning his employment; and (2) records related to Jindra's on-duty activities such as BWC videos, squad videos, and reports. The personnel records are admissible as business records, and the government intends to treat them similar to the POST and HTC records by seeking a stipulation as to their admissibility and/or offering them pursuant to Rules 803(6) and 902(11). *See e.g. United States v. Thompson*, 686 F.3d 575, 580 (8th Cir. 2012) (court did not abuse its discretion in admitting records from the Iowa Workforce Development Agency as non-testimonial business records pursuant to Rules 803(6) and 902(11)).

Although the government believes some portions of the squad and BWC videos would fall under the 803(6) exception, the records of Jindra's on-duty activities – particularly the police reports – are not uniformly covered by Rule 803. However, as set forth in more detail below, these materials are both relevant and admissible as non hearsay in this case.

The United States does not expect that Jindra will object to the authenticity of the exhibits related to his on-duty activities such as the BWC, squad videos and reports, and believes the parties can work together to resolve any questions of authenticity in order to avoid unnecessary foundation witnesses. However, the parties anticipate there will be disputes as to the substantive admissibility of many of these exhibits; the United States will attempt to work with the defense to refine these disputes prior to trial.

**B.  The BWC Evidence is Admissible**

To the extent the government offers BWC video of Jindra or his partners on scene, and those videos contain statements, they are not hearsay. Jindra's statements are non-hearsay and admissible as statements of a party-opponent. Fed. R. Evid. 801(d)(2)(A). Statements made by others on those videos, such as Jindra's fellow officers or the citizens with whom they are interacting, are not hearsay in this instance because they are not being offered for their truth. The statements are being offered to show their effect on the listener: e.g., Jindra, and to provide context to Jindra's responsive statements and actions.  In *United States v. Wright*, 739 F.3d 1160, 1170-71 (8th Cir. 2014), the Eighth Circuit confirmed that a "statement offered to show its effect on the listener is not hearsay."  *See also United States v. Malik*, 345 F.3d 999, 1001 (8th Cir. 2003) ("When the out-of-court statement has relevance when we only consider the effect it had on those who heard…it—not whether the statement was true or not, but just its effect on those who heard it—then the statement is not hearsay." In *United States v. Ralston*, 973 F.3d 896, 913-14 (8th Cir. 2020), the court concluded there was no abuse of the district court's discretion where it admitted out-of-court statements made to explain the defendant's admissions to another person. "Statements providing context for other admissible statements are not hearsay because they are not offered for their truth."  973 F.3d at 913 (quoting *United States v. Spencer*, 592 F.3d 866, 879 (8th Cir. 2010)).

Indeed, in some instances, these statements are being offered to show what was *not* said between Jindra and his partners.  For example, Jindra's failure to tell his partner that he has recovered drugs from a citizen, and the lack of any statement by his partner related

to the drug evidence, is probative of the fact that Jindra did not disclose the evidence to his partner. Moreover, many of the declarants will be testifying at trial and thus any hearsay objection as to their statements can be addressed by the Court during trial.

### C. Police Reports and Incident Detail Reports are Admissible

For the same reasons the BWC is admissible in this case, the police reports and incident detail reports completed by Jindra and his partners related to the various events at issue in the case are admissible because they are relevant, non-hearsay. The statements and representations that Jindra made in these reports are admissible as statements of a party-opponent. Fed. R. Evid. 801(d)(2)(A). The statements of his partners and others at MPD contained within these records are not hearsay because they are not being offered for their truth. *See e.g. United States v. Sparkman*, 500 F.3d 678, 683 (8th Cir. 2007) (police report can be admissible if each layer of hearsay is admissible under the rules of evidence); *United States v. Darden*, 70 F.3d 1507 (1995) (police reports admissible by the government where they were recovered through search warrants of the defendants' premises and used to demonstrate the conspiracy; they were not offered for the truth of the assertions stated therein).

Similar to the live action BWC exhibits showing Jindra's failure to tell his partners about discovering drugs, Jindra's failure to report that he has recovered drugs, and the lack of any report by his partner related to the drug evidence, is probative of the fact that Jindra deceived his partner as well as the MPD.

To the extent the defense objects to portions of these reports as hearsay, irrelevant or prejudicial, we will endeavor to agree on redactions in order to satisfy those concerns.

### D. Experts and Fact Witness Issues

Federal Rule of Evidence 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  However, a witness is not an expert witness merely because he has specialized training and knowledge in a particular field.  Under Federal Rule of Evidence 701, "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Generally, a "lay witness may testify about facts within his or her range of generalized knowledge, experience, and perception."  *United States v. Espino*, 317 F.3d 788, 797 (8th Cir. 2003).

Importantly, Rule 701 "does not distinguish between expert and lay *witnesses*, but rather between expert and lay *testimony*."  Fed. R. Evid. 701, Advisory Committee Notes (emphasis added); *see also Medtronic, Inc. v. Boston Scientific Corp.*, 2002 WL 34447587, at *22 (D. Minn. Aug. 8, 2002) (rejecting distinction "between 'fact or hybrid fact/expert witnesses' and 'expert witnesses' as "counter to the evidentiary rules on expert testimony," which distinguish expert and lay testimony, not witnesses).  For this reason, "[c]ertainly it

is possible for the same witness to provide both lay and expert testimony in a single case." *Id.* (citing *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997) (law enforcement agents could testify that defendant was acting suspiciously, without being qualified as experts; however, the rules on experts were applicable where agents testified on basis of extensive experience that defendant was using code words to refer to drug quantities and prices)). Because "expert" qualifies a witness's *testimony*, "the mere fact that the witness, by virtue of his education, training or experience, is capable of being qualified as an expert, does not serve as a valid objection to his expression of lay opinion testimony." *Hartzell Mfg., Inc. v. Am. Chem. Tech. Inc.*, 899 F. Supp. 405, 409 (D. Minn. 1995) (citing *Farner v. Paccar, Inc.*, 562 F.2d 518, 529 (8th Cir. 1977)).

Testimony about specialized or technical subject matter does not necessarily require scientific, technical, or other specialized knowledge. "[W]hen a lay witness has particularized knowledge by virtue of [his] experience, [he] may testify—even if the subject matter is specialized or technical—because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702." *ADT Sec. Servs., Inc. v. Swenson*, 276 F.R.D. 278, 321 (D. Minn. 2011) (quoting *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009)). Thus, in *ADT Sec. Servs., Inc. v. Swenson*, the District Court for the District of Minnesota "conclude[d] that just as [one of the lay witnesses] may offer lay testimony regarding the content of the Conceal Carry course he teaches, [another of the lay witnesses] may offer factual information about the design and operation of the alarm panel which he developed, designed, and for which he oversaw all engineering." 276 F.R.D. at 321.

13

The key question in distinguishing expert versus lay testimony is whether a witness is offering testimony through his or her specialized knowledge within the realm of an expert, or particularized knowledge by virtue of his or her experience. Courts admit testimony as lay opinion testimony "not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business." Fed. R. Evid. 701, Advisory Committee Notes.[2]

On September 21, 2021, the Government provided the defense with a notice of its intent to call the following expert witnesses to testify in its case-in-chief at trial pursuant to Rule 702 of the Federal Rules of Evidence:

- Sara Goldstrand, Forensic Scientist II, BCA Forensic Science Services Laboratory

- Jeffrey Waite, Lieutenant, Minneapolis Police Department

- James Rugel, Lieutenant, Minneapolis Police Department

- Rod Nelson, Legal Issues Instructor (retired)

---

[2] Courts outside of the Eighth Circuit have reasoned similarly regarding witness-officer's testimony regarding an officer's alleged excessive use of force. In *United States v. Smith*, 811 F.3d 907, 909 (7th Cir. 2016), the Seventh Circuit reasoned that in the prosecution of an officer for depriving two persons of their constitutional right not to be subjected to intentional use of unreasonable force, other officers' testimony that they believed the defendant-officer had used excessive force was not based on scientific, technical, or other specialized knowledge (and thus the failure to qualify the officers as expert witnesses did not preclude its admission). In particular, the Court noted, "[t]he recurring theme of the testimony of the officers who had witnessed Smith's assaults . . . was that his use of force against them was unjustified because they weren't resisting." *Id.* Thus, "[i]t would have been absurd to require the police officers to be qualified as experts on the use of force . . . in order for them to be permitted to give testimony that a witness with no police training or experience could have given with utter confidence—and indeed that jurors would have found obvious without any evidence other than what the police had witnessed." *Id.*

- Alan Harris, Managing Assistant Hennepin County Attorney (retired)

On September 21, 2021, the Government also provided to defense the relevant curricula vitae and available statements and materials that will form the basis for these witnesses' testimony. Although the government disclosed each of the aforementioned witnesses as a potential expert, it did so in an abundance of caution as to some of them. As set forth below, much of the testimony from these witnesses is more appropriately construed as lay witness testimony under Rule 701. In either case, it is admissible.

Ms. Goldstrand is expected to testify regarding her laboratory analysis of the controlled substances involved in Counts 4 and 5 of the Indictment, as well as other evidence collected in the case. She will testify as to the procedures used by the BCA in drug analysis, and her conclusions regarding the makeup of the substances, and provide general testimony about controlled substances. Ms. Goldstrand's testimony is clearly expert in nature.

The remaining witnesses are either fact witnesses, some of whom may offer lay opinions pursuant to Rule 701, or mixed fact/expert witnesses.

Lieutenant Waite will be testifying as a mixed fact/expert witness. He will testify about MPD policies such as report writing, conducting stops, searches (of persons and vehicles) and arrests, handling drug evidence, and other MPD policies related to this case. Lieutenant Waite's testimony will cover the policies as well as their implementation in the field. The United States does not view this portion of his testimony as expert in nature; it is not technical or scientific; it is specialized based on his many years of experience.

Lt. Waite is also expected to provide testimony, based on his training and experience which includes 17 years working narcotics investigations, describing the packaging and appearance of illegal narcotics that law enforcement encounter in the course of their duties. As it relates to the charged incidents, he will provide an opinion about whether the items Jindra is seen handling in the body worn camera videos were packaged, possessed and/or stored consistent with controlled substances. Expert testimony about drugs and the drug trafficking business is well accepted in the Eighth Circuit. *See e.g. United States v. Robertson,* 387 F.3d 702, 704 (8th Cir. 2004) (district court did not abuse its discretion in allowing police officers to testify as experts regarding drug trafficking, because "[t]he business of drug trafficking and the modus operandi of drug dealers are matters unfamiliar to jurors.")(citation omitted); *United States v. Solorio-Tafolla,* 324 F.3d 964, 965 (8th Cir. 2003) (allowing detective with 28 years' experience to provide expert testimony on drug quantities obtained for personal use and other aspects of drug business); *United States v. Williams,* 982 F.2d 1209, 1212 (8th Cir. 1992) (the identity of a controlled substance can be proved by circumstantial evidence and opinion testimony, including from an experienced narcotics detective who testified that in his opinion the government's exhibits were crack cocaine, and expressly referred to the government's exhibit as "an awful big piece of crack cocaine ... a pretty big chunk.").

Lieutenant Rugel will testify regarding the operation of technology and record creation systems utilized by the MPD as relevant to this case, including body worn cameras, mobile computers, squad cameras, and the report writing systems Computer Assisted Police Records System (CAPRS)/Police Information Management System

(PIMS). Lieutenant Rugel is the Commander of the MPD's Business Technology Unit and Strategic Information Center, and also has experience as a patrol lieutenant within the MPD. In the government's view, his testimony – though based on specialized training – is still fact based. However, to the extent the Court views it as expert testimony, he is well suited to provide it.

Rod Nelson and Alan Harris each played a role in teaching Jindra and his contemporaries the law surrounding search and seizure. Mr. Nelson taught the "Legal Issues for Law Enforcement" class that Jindra attended as part of the required coursework for the POST exam. Mr. Nelson also taught the portion of the coursework for Jindra's class which included live scenarios involving search and seizure and other legal issues. Mr. Nelson will testify regarding the basic principles of search and seizure that were covered during the course and the simulations. He is also expected to provide an opinion about whether Jindra's searches in this case were consistent with the training he provided.

Mr. Harris taught search and seizure issues to new police officers. Mr. Harris oversaw the Fourth Amendment/Search and Seizure course at the Minneapolis Police Department Academy for several years. Mr. Harris taught many of the courses himself, created a PowerPoint for the course, and supervised other Assistant County Attorneys who sometimes filled in, and ultimately took over for him. According to MPD records, Mr. Harris taught the course in September 2014 when Mr. Jindra was in the police academy, although Mr. Harris has no specific recollection of the specific class. Mr. Harris will testify regarding the basic principles of search and seizure that were covered during the course. Mr. Harris will also testify about periodic in-service trainings conducted for the MPD

17

related to search and seizure, as well as other legal issues. The government anticipates Mr. Harris will provide an opinion about whether Jindra's searches in this case were consistent with the training that was provided to Minneapolis police officers during the relevant time period.

Although Mr. Nelson and Mr. Harris each will testify regarding an area of specialized knowledge, that knowledge is based on "particularized knowledge that the witness has by virtue of his or her position in the business." Fed. R. Evid. 701, Advisory Committee Notes.

### III.   THE UNITED STATES' MOTIONS IN LIMINE

### 1. Admissibility of Rule 404(b) Evidence

The Government has moved the Court for an order allowing the admission of evidence related to two incidents involving the defendant, pursuant to Federal Rule of Evidence 404(b). The first incident involves an October 7, 2017 traffic stop that led to a citizen complaint about Jindra's encounter with the driver. The complainant witnessed then-Officer Jindra pull over a driver, open the driver's door then have a tense conversation with the driver. During the conversation with the driver, Officer Jindra pulled out his gun and placed it to his side, which the complainant believed to be an unnecessary escalation of the situation. While the driver had one hand on the steering wheel and the other on her phone, Officer Jindra attempted to pull her from the vehicle. Because the vehicle was still in gear and had not been placed in park, it moved forward slightly. At this point, Officer Jindra holstered his gun then pulled his stun gun and pointed it at the driver. The complaint alleged that the driver was arrested after being removed from her vehicle, and then Officer

Jindra performed an illegal search of her vehicle in violation of the 4th Amendment and policy.

As a result of this complaint, Officer Jindra was notified by the City of Minneapolis Office of Police Conduct Review, by at least May 10, 2018, that he was being investigated for violations of MPD's Professional Policing and Search and Seizure policies. Jindra also failed to complete a CAPRS report for his search of the vehicle, a violation that was later noted. The government seeks to introduce the BWC video of Officer Jindra's interaction with the driver as well as the notice Officer Jindra received informing him of the complaint and policy violations for which he was under investigation.[3] The government does not intend to introduce evidence that the complaint and subsequent determination that Jindra violated several MPD policies culminated in his termination. Nor does the government intend to offer evidence pertaining to any statements Officer Jindra made related to the complaint or investigation to MPD Internal Affairs.

Second, the Government seeks to introduce evidence related to an incident on September 22, 2019 when Jindra and his partner responded to an overdose call at a residence in the 2200 block on Bryant Avenue North in Minneapolis. While emergency personnel were dealing with a nonresponsive person who appeared to be overdosing and his partner was dealing with another individual at the scene, Officer Jindra entered the subject residence and conducted a search without lawful basis. While in the residence, Officer Jindra conducted an extensive search of various items, including a backpack or bag

---

[3] The government provided notice to the defendant of its intent to offer evidence of this incident under Rule 404(b) by letter dated September 21, 2021.

he found.   After he appeared to discover drugs inside the backpack, Officer Jindra deactivated his BWC – in violation of MPD policy – for over six minutes.   The government seeks to introduce evidence of this incident to show that as part of Officer Jindra's scheme to obtain possession of controlled substances, he engaged in unwarranted searches, turned off his BWC when he located drugs during those searches and failed to report his conduct in MPD reports.   The government intends to offer evidence of this incident through the BWC videos of Officer Jindra and his partner on scene, as well as the MPD report regarding the incident.

Evidence of other crimes, wrongs or acts is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."   Fed. R. Evid. 404(b).   Such evidence is admissible under Rule 404(b) if it is: "(1) relevant to a material issue; (2) similar in kind and not overly remote in time to the crime charged; (3) supported by a preponderance of the evidence; and (4) higher in probative value than in prejudicial effect." *United States v. Buckner*, 868 F.3d 684, 687-88 (8th Cir. 2017). The Eighth Circuit has repeatedly held that Rule 404(b) "is a rule of inclusion, prohibiting only evidence that tends solely to prove the defendant's criminal disposition." *United States v. Ali*, 799 F.3d 1008, 1026 (8th Cir. 2015).

All of the factors supporting admissibility are met with the respect to both events.

a.   The evidence is related to a material issue.

In this case, Jindra is charged with abusing his position as a Minneapolis police officer to obtain controlled substances for himself through misrepresentation, fraud, deception and subterfuge.   Among other things, as part of the scheme, Jindra would conduct

searches of persons, vehicles and residences that exceeded the scope warranted under the circumstances in order to recover controlled substances that he could retain for himself. Jindra would also fail to report the extent of his searches or recovery of drugs in MPD reports.

The evidence of Jindra's interaction with the driver in the October 7, 2017 incident is both relevant and admissible to show Officer Jindra's motive, opportunity, intent, knowledge, absence of mistake and lack of accident in (1) conducting searches and seizures in violation of the Constitution and MPD policy; and (2) failing to report his conduct in MPD reports.  With respect to Counts 9 through 11, this evidence is also relevant and admissible to show Officer Jindra's knowledge, intent, lack of mistake or accident in willfully depriving individuals of the right to be free from unreasonable search and seizure despite being well aware of the law.   *See United States v. Boone*, 828 F.3d 705, 711-12 (8th Cir. 2016) (holding that district court did not abuse its discretion in admitting evidence of defendant's prior use of force as evidence of intent, knowledge, motive and absence of mistake).

With respect to the 2019 residence search, the evidence of Jindra's unwarranted search of the residence and turning off his BWC while doing so is similarly relevant and admissible as to Officer Jindra's motive, opportunity, intent, plan, knowledge, absence of mistake and lack of accident when he conducted the unauthorized searches and seizures charged, turned off his BWC when he acquires drug evidence and fails to report his illegal searches and seizures to MPD.

b.   <u>The evidence is similar in kind and not overly remote in time to the instant offense.</u>

Jindra's actions with respect to both the 2017 and 2019 incidents are similar in kind and not overly remote to the crimes charged in the Indictment. Jindra's 2017 search of the driver's vehicle without lawful basis and failure to report his conduct in his MPD report is very similar to several counts charged in this case.  The same is true of Jindra's illegal search of the Bryant Avenue North residence and deactivation of his BWC upon acquiring drug evidence.  Moreover, both incidents occurred in the middle of the time frame alleged in the Indictment, September 2017 through October 2019.   Accordingly, neither is remote in time to the instant offenses.

c.   <u>The evidence is proved by a preponderance of the evidence.</u>

The proffered evidence regarding the 2017 incident comes in the form of BWC video of Jindra's interaction with the driver, the MPD report he authored and the notification letter he received informing him of the complaint and investigation.[4]   The proferred evidence concerning the 2019 residential search consists of BWC video of the officers present and the report of the incident.[5]  "In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor."  *United States v. Armstrong*, 782 F.3d 1028, 1034 (8th Cir. 2015) (quoting *Huddleston v. United States*, 485 U.S. 681, 689 (1988).   The evidence with respect to both incidents satisfies the requisite preponderance standard.

---

[4] All of this evidence is admissible as either statements of a party-opponent or under the business records exception to the hearsay rule.

[5] The evidence does not contain hearsay and is otherwise admissible.

    d.    <u>The probative value of the evidence is not substantially outweighed by the danger of unfair prejudice under Rule 403.</u>

Finally, the evidence offered of these incidents is highly probative and not unduly prejudicial.  Accordingly, it meets the requirements of Fed. R. Evid. 403. "[Rule 403] does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case. The rule protects against evidence that is unfairly prejudicial.'" *United States v. Evans*, 802 F.3d 942, 946 (8th Cir. 2015) (internal quotation marks omitted).  *See also*, *United States v. Adams,* 401 F.3d 886, 899–900 (8th Cir. 2005) (Rule 404(b) evidence admissible where not "so inflammatory on [its] face as to divert the jury's attention from the material issues in the trial.")(internal quotation marks omitted) (alteration in original).

The evidence of Jindra's awareness of the 2017 complaint and investigation and notification of the policies his conduct was alleged to have violated is highly probative of Jindra's knowledge and intent.   The same is true of Jindra's unauthorized search of a residence well after he was notified that his conduct was under scrutiny and deactivation of his BWC upon obtaining drug evidence.   Such evidence does not pose a risk of unfair prejudice under Rule 403.

To ensure the jury's proper use of such information if admitted under Rule 404(b), the government respectfully requests that the Court issue cautionary instructions regarding the appropriate use of the evidence both at the time of its admission and during final instructions. *See United States v. Thomas*, 398 F.3d 1058, 1063 (8th Cir. 2005) (citing *United States v. Mays*, 822 F.2d 793, 797 (8th Cir. 1987) (noting that "the use of a limiting

instruction decreases the danger that unfair prejudice will result from admission of the evidence")).

## 2. Motion to Preclude Jindra From Offering Improper Character Evidence or Impeachment

The United States moves to preclude Jindra or his counsel from offering evidence of, or cross-examining a witness regarding, any act committed by any witness pursuant to Federal Rules of Evidence 404, 608, or 609 in the presence of the jury without first providing a basis for inquiry of the alleged bad act or conviction outside of the presence of the jury, so that counsel for the United States may be heard on the admissibility of such evidence. Likewise, the United States asks the Court to preclude the Defendant from offering improper character evidence of any of its witnesses, including law enforcement witnesses, on cross-examination without first providing the United States with an opportunity to be heard on its admissibility.

The United States believes that Jindra intends to offer evidence of MPD personnel issues regarding his former partners, several of whom will testify as witnesses in the case, including complaints filed against those officers and MPD's action in response to those complaints. Such an argument or line of inquiry should be excluded absent a particularized showing that it speaks to the officer's credibility or is otherwise relevant and not unfairly prejudicial. The United States requests that counsel for the United States and Defendant discuss any such testimony or argument with the Court in sidebar before it is offered or made.

**3. Motion to Preclude Jindra From Offering Irrelevant Evidence Designed to Inflame the Jury or Encourage Jury Nullification**

Jindra may attempt to introduce irrelevant evidence that is inflammatory and unfairly prejudicial for the purpose of jury nullification. The government anticipates that Jindra may seek to introduce the following categories of such evidence:

(a) Evidence that Jindra's supervisors violated his contractual rights when they met with him without his union representative present, that the MPD discriminated against him based on a mental disability, or that the MPD's actions toward him are politically motivated in order to cover up other wrongful conduct within the department;

(b) Evidence that Jindra was among the first to respond when a woman who called 911 for help was shot and killed by a Minneapolis Police officer in 2017, and that he suffers from post-traumatic stress disorder as a result of the incident; and

(c) Evidence referencing national or local controversies regarding use of force or other misconduct by police officers, or national or local news regarding increasing rates of violent crime, absent a particularized showing that such an argument or line of inquiry is relevant to the crimes charged.

The foregoing categories of evidence are irrelevant and barred by Fed. R. Evid. 403. The United States respectfully seeks an order precluding Jindra from raising them, either through argument or cross examination. Such evidence or argument is impermissible as it would serve no purpose other than to improperly encourage jurors to set aside the Court's instructions and decide the case on an impermissible basis. The government seeks to

highlight this concern before the start of trial because any reference to Jindra's potential nullification evidence—even if just during *voir dire* or opening—could result in prejudice that cannot be undone by the Court simply sustaining a timely objection from the government.

Certainly such nullification evidence is not relevant under Fed. R. Evid. 401. Jindra's potential nullification evidence would encourage jurors to act in direct conflict with the stated goals of Rule 403 of the Federal Rules of Evidence because such evidence would serve only one purpose: to inflame the jury's emotions. Admission of this sort of evidence would substantially risk unfair prejudice and confusion, and would likely mislead the jury by distracting it from the actual elements of Jindra's charged conduct. In order to avoid such a result, and in order to adhere to the tenets and principles of the Federal Rules of Evidence, the Court should not allow such evidence.

The importance of guarding against attempts at jury nullification is supported by longstanding precedent and practice. *See e.g. United States v. Wiley*, 503 F.2d 106, 107 (8th Cir. 1974) ("To encourage individuals to make their own determinations as to which laws they will obey and which they will permit themselves as a matter of conscience to disobey is to invite chaos."); *United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir. 1993) ("the Court shall step in and 'block defense attorneys' attempts to serenade a jury with the siren song of nullification"); *United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983) ("[N]either the court nor counsel should encourage jurors to violate their oath.") (citing *United States v. Dougherty*, 473 F.2d 1113, 1130-37 (D.C. Cir. 1972)); *United States v. Moylan*, 417 F.2d 1002, 1006 (4th Cir. 1969) ("Public and private safety alike would be in

peril if the principle be established that juries in criminal cases may, of right, disregard the law as expounded to them by the court, and become a law unto themselves.").

Based on the foregoing, and all of the records and proceedings in this case, the United States respectfully asks the Court to grant its motions in limine as set forth herein.

Date:  September 29, 2020                    Respectfully Submitted,

                                             W. ANDERS FOLK
                                             Acting United States Attorney

                                             *s/ Amber M. Brennan*
                                             BY: AMBER M. BRENNAN and
                                             MICHELLE E. JONES
                                             Assistant United States Attorneys