UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-251 (DWF/ECW)

UNITED STATES OF AMERICA,

                       Plaintiff,

     v.

TY RAYMOND JINDRA,

                       Defendant.

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

## INTRODUCTION

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Michelle E. Jones, Assistant United States Attorney, herein sets forth its position with respect to the sentencing of defendant Ty Raymond Jindra.

Ty Jindra abused his authority as a Minneapolis police officer to steal drugs for his personal use from citizens with whom he interacted in the course of his duties. He similarly abused his authority as a peace officer by violating the constitutional rights of members of the community in order to obtain drugs for himself. After a 10-day trial, a jury convicted him of multiple counts of obtaining controlled substances by fraud and depriving citizens of their constitutional rights while on duty as a Minneapolis police officer. For the reasons set forth herein, the United States requests that the Court impose a sentence of 41 months of imprisonment, the top of the advisory Sentencing Guidelines range in this case. Such a sentence is sufficient, but not greater than necessary, to comply with the purposes of

criminal sentencing, including reflecting the seriousness of the offense, promoting respect for the law, deterrence, and providing just punishment.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Jindra was hired by the Minneapolis Police Department ("MPD") in February 2013 as a Community Service Officer ("CSO").  (PSR ¶ 7.)  CSOs work as non-law enforcement employees while they complete their academic and other law enforcement requirements. (*Id.*)  After completing the requisite training and coursework, Jindra became a sworn police officer in November 2014; he held that position until October 2019.  (*Id*.)  During his tenure as a sworn MPD officer, Jindra worked principally as a patrol officer responding to 9-1-1-calls and conducting traffic stops in the Fourth and Fifth Precincts in Minneapolis.   In addition to his patrol duties, Jindra was also briefly assigned to the Community Response Team ("CRT"), *see* Govt. Ex. 7.  CRT officers may be assigned to address livability issues such as drug dealing and prostitution, surveillance, crowd control, and patrol in crime specific areas.   In March of 2019, Jindra underwent training to become a field training officer ("FTO"). (*See* Govt. Ex. 12.)  FTOs are partnered with new officers to train them to assume increasing responsibility during the first several months after the new officers graduate from the MPD academy.  After he completed the required training, Jindra served as an FTO for other patrol officers.

In the fall of 2019, the MPD received multiple complaints that Jindra was engaging in erratic, aggressive, or unnecessarily escalating behavior with members of the public. (PSR ¶ 8.)  The complaints included a complaint made by a paramedic regarding Jindra's conduct at the scene of a drug overdose on September 22, 2019.  (*Id*.)   The confluence of

2

these complaints, along with the fact that one was made by a fellow civil servant, prompted Jindra's supervisors at the MPD to review his Body Worn Camera ("BWC") videos of the incidents at issue. (*Id.*) Jindra's BWC video of the September 22, 2019 incident showed that while paramedics attended to an overdose victim on the lawn in front of a house, Jindra entered the house – ostensibly to clear it for safety reasons. (PSR ¶ 9.) However, upon entering the house, rather than checking the house fully for any occupants, Jindra instead searched through a bag he located in one of the downstairs rooms. (*Id.*; Govt. Ex. 116.) His search of the bag included opening small containers within it. (*Id.*) Upon opening one such container, Jindra located an item of interest then immediately turned off his BWC and left it off for more than six minutes while still inside the residence. (*Id.*) Jindra only reactivated his BWC after his partner came into the residence to locate him; his partner found him in the same room in which Jindra had located the container of interest. (*See id.*; Govt. Exs. 116, 117, 118.) After the review of that BWC video and others, the MPD internal affairs unit began an investigation. Upon concluding that Jindra may have committed a crime, the internal affairs unit of the MPD referred the matter to the Federal Bureau of Investigation. (*Id.* ¶ 9.)

On November 4, 2020, an 11-count Indictment was filed charging Jindra with six counts of acquiring a controlled substance by deception, in violation of 21 U.S.C. §§ 843(a)(3) and (d)(1); two counts of extortion under color of official right, in violation of 18 U.S.C. § 1951(a); and three counts of deprivation of rights under color of law, in violation of 18 U.S.C. § 242.

After his arrest on the Indictment in November 2020, Jindra was released on bond with conditions that included no contact with victims or witnesses in this case. (PSR ¶ 3; ECF No. 8.) On February 4, 2021, the United States moved to revoke Jindra's pretrial release status based on a January 30, 2021 text message he sent to a potential witness in which he stated, among other things: "Slander, defamation, karma, something coming for ya I guess. . . never bothered you destroying a Friend at all? Scaring off partners from talking to me, just soft lol what are you worried about? Real Man [redacted]. Real Man. See you soon buddy." (*Id.* ¶¶ 3, 19.) The magistrate judge concluded that, although Jindra had violated his release conditions by contacting a potential witness in the case, his conditions of release could be modified to avoid future violations. (*See* ECF Nos. 34, 36.) Jindra was subsequently released pending trial. (*Id.*)

Following a 10-day jury trial, on November 2, 2021, Jindra was convicted of three counts of acquiring a controlled substance by deception and two counts of deprivation of rights under color of law. (PSR ¶ 2; ECF No. 76.) He was acquitted on the remaining counts. (*Id.*)

## II.   THE OFFENSE CONDUCT

### A.   Acquiring a Controlled Substance by Deception

Jindra was convicted of acquiring a controlled substance by deception on three separate occasions. During each of the interactions with citizens that form the basis for these counts, Jindra stole controlled substances he obtained from citizens during traffic stops or other encounters, hid his theft of the controlled substances from his partner at the

scene, and either failed to report having confiscated the drugs or completed false reports regarding the incident.

1. September 7, 2017 Traffic Stop

On September 7, 2017, while on patrol with another officer, Jindra conducted a traffic stop of a vehicle for expired tabs. (PSR ¶ 10.) During their interaction with the occupants of the car, Jindra and his partner discovered that the female driver had provided them a false name and eventually removed her from the car. (*Id*.) Upon doing so, they found counterfeit currency on her. (*Id*.) The male passenger was found in possession of methamphetamine. (*Id*.) After arresting the car's occupants, Jindra's partner located a prescription bottle containing several dozen pills while searching the vehicle. (*Id*.) Jindra's BWC showed him taking the pills from his partner and eventually looking up the markings on the pills on the squad computer. (*Id*; Govt. Ex. 18.) After learning that the markings on the pills indicated that they were Tramadol, a controlled substance, Jindra took the pill bottle to the rear of the squad car. (*Id*.) While his partner was occupied with other matters related to the stop, Jindra poured some of the pills from the bottle into a plastic envelope, then placed the lid back on the pill bottle with some of the pills remaining in the bottle. (*Id*.) Jindra then put the pill bottle and the envelope in his personal duty bag. (*Id*.) However, Jindra did not tell his partner that the pills appeared to be a controlled substance based on their markings, nor did he tell his partner that he had put the pills into his duty bag. (*Id*.) Jindra also failed to document in a report that he and his partner found Tramadol pills during the stop, and he failed to place the pills into evidence at the MPD, despite logging the methamphetamine found on the car's passenger into evidence. (*Id*.) At trial,

5

a chemist from the Minnesota Bureau of Criminal Apprehension ("BCA") testified that the markings on the pills ("AN627") were consistent with Tramadol, an opioid painkiller and controlled substance. (*Id*.)

2.   June 3, 2019 Incident

On June 3, 2019, Jindra responded to a homeowner's request to the MPD for assistance after she found a bag of suspected narcotics on her garage roof.  (*Id*. ¶ 11.) Jindra's BWC video from the incident shows the homeowner hand him a bag of suspected narcotics and describe the circumstances that led to its discovery on top of her garage.  (*Id*; Govt. Ex. 59.)  The bag she gave Jindra was larger in size than a golf ball and contained several smaller baggies with white crystalline or powder substances in them. (*Id*.) However, the quantity of suspected narcotics that Jindra subsequently placed into evidence was substantially smaller than the quantity he received from the homeowner.  (*See* Govt. Exs. 55, 56, 57 and 58.)  In fact, the bags logged into evidence contained only a few crystals and weighed less than 1 gram. (*Id*. at 57.)  Although the MPD evidence chain of custody forms showed that Jindra checked out the drugs he logged into evidence from the homeowner for a two-week period in July 2019 to take them to the BCA for testing, a BCA employee testified at trial that the BCA had no record of ever receiving or testing the drugs during that period. (*See* PSR ¶ 11.)  One of the items Jindra had removed and returned to the evidence room was eventually tested by the BCA and tested positive for methamphetamine. (*See id.*)

3.    July 24, 2019 Traffic Stop

On July 24, 2019, Jindra and his partner stopped a vehicle they observed driving recklessly and committing traffic violations. (PSR ¶ 12.) The driver was arrested after a black vial of pills marked as oxycodone, and for which he had no prescription, was found in his sock. (*Id*.) While his partner was otherwise occupied, Jindra's BWC showed him pour some of the pills from the vial into his left hand. (*Id*.; Govt. Ex. 74.) He then poured some of the pills back into the vial while maintaining some in his hand. (*Id*.) Afterward, Jindra put the vial of pills into a clear evidence envelope, which he then placed into the front pocket of his duty bag where it was visible to his partner. (*See id*.) Jindra then removed the glove on his left hand, encasing the remaining pills in that hand inside the glove and put both of his gloves into his duty bag. (*Id*.) Again, Jindra never notified his partner or the MPD that he had stolen some of the pills from the vial. The driver was eventually charged with felony drug possession based on the pills that Jindra placed into the evidence bag. (*Id*.) Those pills were tested by the BCA and tested positive for the presence of fentanyl, a controlled substance. The BCA chemist who tested the pills also testified at trial that fentanyl pills are sometimes labeled as oxycodone, also a controlled substance. (*Id*.)

B.    Deprivation of Rights under Color of Law

The jury convicted Jindra of two instances of depriving citizens of their constitutional rights to be free from unlawful searches and seizures.

1.     July 5, 2019 Incident

On the evening of July 5, 2019, Jindra followed a vehicle driven by an African American male to a gas station. (*Id*. ¶ 13.) Jindra's BWC video shows him confront the driver about the vehicle not having an affixed license plate, though a temporary tag was visible on the back window and a license plate was visible on the back window ledge. (*See* i*d*.; Govt. Ex. 96.) While the driver repeatedly asks what he did, Jindra questions him about not having a license plate on the car and notes that the temporary tag on the window is expired, in an increasingly confrontational tone. (*Id*.) Despite the driver's attempts to direct Jindra to the license plate on the window ledge, Jindra demands the driver's license and proof of insurance. (*Id*.) Prior to receipt of any documents from the driver raising any concerns, Jindra notifies dispatch that he has stopped an unlicensed and suspicious vehicle. (*Id*; Govt. Exs. 95, 96*.*) While the driver continues his attempts to show Jindra the license plate in the car, Jindra threatens to put him in handcuffs if the driver doesn't give Jindra his license and registration. (*Id*.; Govt.. Ex. 96.) After receipt of an identification card rather than a driver's license, Jindra directs the driver to step out of the vehicle, pat searches and handcuffs him, and places him in the rear of Jindra's squad car. (*Id*.) Jindra then proceeds to search the car, including the driver's wallet. (PSR ¶ 13.)

While searching the passenger-side front door, Jindra locates an item of interest and inspects what appears to be a folded-up piece of currency with something inside of it. (*Id*.) Jindra then takes the item to his squad car and asks the driver what it is; the driver responds that he does not know. (*Id*.; Govt. Ex. 96.) The contents of the item are not visible from the BWC video. (*Id*.) After threatening to tow the driver's vehicle and accosting a

bystander whom he accuses of interacting with the driver, Jindra releases the driver and instructs him to put his license plates on the vehicle. (*Id*.; Govt.. Ex. 96.)  The driver again tries to explain that he received his license plates that day.  (*Id*.)  Jindra responds that he is going to give the driver a break because the driver does not have a license.  (*Id*.)  Jindra did not ticket the driver for not having a license or proof of insurance, nor did he document that he had searched the driver's car and recovered an item that he suspected to be narcotics. (*See* Govt. Ex. 95.)  It is unclear what happened to the folded-up currency and its contents. (PSR ¶ 13.)   Despite the driver's lack of a driver's license and proof of insurance, Jindra did not have a lawful basis to handcuff him and search his vehicle for those traffic-related violations.

### 2.   October 13, 2019 Traffic Stop

On the afternoon of October 13, 2019, Jindra and a partner followed a car occupied by three African American males after observing it fail to stop completely at a stop sign. (PSR ¶ 14.)  While the driver was driving at a slow speed attempting to find an unoccupied spot to pull over, Jindra repeatedly yelled at the driver to pull over via the squad car's public address system.  (*Id*.)  After the car stopped, Jindra angrily approached the driver-side door with his gun drawn, despite the only violation having been committed being a traffic infraction.   (*Id*.; Govt.. Exs. 103, 104.)  Upon arriving at the vehicle, Jindra hit the driver side passenger door and told the passenger to "put [his] hands up." (*Id*.)  Jindra then ordered the driver out of the car.  (*Id*.)  As the driver stepped out of the car, with one hand in the air, and the other hand attempting to place the cell phone that had been on his lap into his front pocket, Jindra forced the driver to the ground, yelling "What are you doing?

. . . Goddam, what are you fucking thinking?" (*Id.*; Govt. Ex. 104.)  After handcuffing the driver and taking him to the squad car, Jindra searched the driver's pockets while informing him that he was stopped for rolling through the stop sign.  (*Id.*)  Upon removal of the two remaining occupants of the car, Jindra initiated a search of the car.  (*Id.*)  Prior to doing so, the only unlawful conduct of which Jindra was aware was a traffic violation; he had no lawful basis to remove the occupants from the vehicle or search it.  (*Id.*)

## III.    SENTENCING PROCEDURE AND GUIDELINES

The Supreme Court set forth the appropriate sentencing methodology in *Gall v. United States*, 552 U.S. 38 (2007).  Initially, the district court should calculate the advisory Sentencing Guidelines range and determine whether a traditional departure is justified. *Gall*, 552 U.S. at 49-50; *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate guideline range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.").  After hearing from the parties, the district court should consider the sentencing factors set forth in 18 U.S.C. § 3553(a) to determine an appropriate sentence. *Gall*, 552 U.S. at 50.

Although the Sentencing Guidelines are advisory, the Court "must remain cognizant of them throughout the sentencing process."  *Gall*, 552 U.S. at 50 n.6.   Based on Jindra's convictions on three counts of acquiring controlled substances by deception and two counts of deprivation of rights under color of law, the PSR calculated a total offense level of 20 and a criminal history category of I, resulting in a Guidelines range of 33 to 41 months of

imprisonment.  (PSR ¶¶ 61, 66, 116.)  The maximum term of imprisonment for the acquiring drugs by deception counts (Counts 1, 4 and 5) is four years.  (*Id*. ¶ 115.)  The maximum term of imprisonment for the deprivation of rights under color of law counts (Counts 9 and 10) is one year.  A supervised release term of one year may be imposed for each of the five counts of conviction.  (*Id*. ¶ 119.)  The fine range is $15,000 to $150,000.  (*Id*. ¶ 124.)  The Government agrees with the Guidelines calculations set forth in the PSR and requests that the Court adopt them.

## IV.   THE SENTENCING FACTORS SET FORTH IN 18 U.S.C. § 3553(a) SUPPORT A SENTENCE AT THE TOP OF THE GUIDELINES RANGE.

After determining the advisory Sentencing Guidelines range, the Court may not assume that the range is reasonable, but instead "must make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.  In so doing, the Court must consider a number of factors set forth in 18 U.S.C. § 3553(a).  They include (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence to reflect the seriousness of the offense; (4) to provide just punishment for the offense; (5) to afford adequate deterrence to criminal conduct; (6) to protect the public from further crimes of the defendant; and (7) the need to avoid unwarranted disparities. 18 U.S.C. § 3553(a).  The government believes that consideration of these factors supports imposition of a sentence of 41 months' imprisonment.

A.   Jindra's History and Characteristics

Jindra had a stable family life and opportunities that gave him considerable advantages.  Jindra has no criminal history of consequence and, thus, zero criminal points.

11

(PSR ¶¶ 63-68.)  He grew up in a close-knit family and had a stable upbringing.  (*Id*. ¶¶ 70-71.)  He was also raised with multiple immediate family members who served as law enforcement officers.  (*Id*.)  Jindra attended college while applying to work at the MPD and continued those classes until he began the MPD police academy.  (*Id*. ¶ 72.)  Prior to becoming a sworn peace officer, Jindra served for six years in the Minnesota National Guard and was deployed to Kuwait and Iraq as part of his military service.  (*Id*. ¶ 83.)  Jindra received several medals and ribbons of commendation during his military career and was honorably discharged.  (*Id*. ¶ 101.)  Unlike many defendants who appear before the Court, Jindra received the care and opportunities that should have afforded him the ability to live a life free of criminal activity.

Jindra's personal history also includes some significant challenges.  During the course of his seven-month deployment to Kuwait, Jindra lost friends who were also in the military and personally witnessed others lose their lives. (*Id*.)  Based on experiences related to his deployment, and his work as an MPD officer, Jindra has been diagnosed with PTSD and anxiety and prescribed various medications over the years, including Xanax.  (*Id*. ¶¶ 84-90.) Jindra has expressed that he experienced significant trauma as a result of his involvement as one of the first responding officers to a shooting that occurred in 2017.  (*Id*. ¶¶ 85-86, 88, 89.)  According to Jindra, the trauma he experienced relating to this incident was exacerbated by being called as a witness in the subsequent trial and reliving the incident during that trial.  (*Id*.)  As a result of his military service and his traumatic experience while working as an MPD officer, Jindra has struggled with his mental health, necessitating medical intervention on a number of occasions over the years.  (*Id*. ¶¶ 84-92.)

During one such occasion in 2017, Jindra admitted abusing his anti-anxiety medication, Xanax, along with alcohol.  (*Id*. ¶ 88.)   He has since acknowledged his struggle with chemical dependency related to Xanax and alcohol and admits that his abuse of both increased in 2018 and 2019, the general timeframe during which he committed the crimes of which he was convicted.  (*See id*. ¶ 95.)

B.    The Nature, Circumstances and Seriousness of Jindra's Crimes, Deterrence and Just Punishment

Ty Jindra's crimes constitute a profound betrayal of the authority entrusted to him by the community in which he served.  As an MPD officer, Jindra was expected to protect and serve his community.  His responsibility was to protect members of the public from crimes and deter criminal activity.   Instead, he victimized community members by committing crimes against them himself.  Jindra repeatedly took advantage of his authority as a police officer to steal drugs he came across during the performance of his official duties.  He also exploited his seniority over other officers, his status as an FTO, and his partners' unqualified trust that he was a law-abiding colleague by directing some of them to engage in other tasks during traffic stops or other contacts with the public *for the express purpose of* creating opportunities for him to steal drugs for his personal use.  Not only did Jindra betray the trust of community members and his unsuspecting colleagues to create opportunities to steal drugs, he further abused his power and authority as a police officer by conducting searches and seizures of citizens *knowing, based on his training and experience, that he did not have a lawful basis to do so*.

The reason Jindra committed these crimes is both simple and devastating – because he assumed he could get away with it. As a patrol officer in precincts burdened by crime, Jindra knew that the citizens he victimized would be unlikely to report him for stealing drugs and conducting unlawful searches and seizures. He knew this because of myriad factors such as the victims' awareness that Jindra could arrest them for possessing the drugs he took from them, their own experiences with the criminal justice system, prior encounters with law enforcement, and mistrust of law enforcement officers generally. Simply put, he committed the crimes of which he was convicted because he knew the uniform he wore and the badge he carried evoked a form of intimidation that would keep his victims silent. And, unfortunately, for some time he got away with those crimes.

Jindra's crimes have caused incalculable damage to the community and the MPD. As a result of Jindra's actions, the citizens with whom he interacted, and unquestionably others, will be understandably wary of the motives and actions of law enforcement officers. His crimes harm the community's relationship with the MPD during a time of, perhaps, unprecedented distrust between the community and police officers and engender suspicion and distrust of hundreds of honest men and women who take seriously their oaths as sworn police officers and put their lives in jeopardy daily in the course of their duties. A victim impact statement provided to the Court highlights this distrust: "[Sentencing the defendant is] good. But what is this case going to solve? When there are millions more like him?" (PSR ¶ 17.) The harm caused by Jindra's crimes is both real and substantial. Jindra's crimes and the resultant distrust that they sow between police officers and the community

also likely contribute to others being unwilling to pursue a career in law enforcement because of the erosion of trust between the community and the MPD.

The crimes Jindra committed are especially serious because he abused a position of public trust – his status as a sworn police officer – to accomplish them.  He held one of the fairly limited positions that require an extraordinary amount of trust and collaboration with the community to be effective.  The people society entrusts to investigate criminal activity and protect citizens from crime cannot be permitted to engage in the same conduct they are sworn to deter and prevent. Jindra should be held accountable for his crimes, like anyone else who unlawfully possesses controlled substances, because police officers cannot be viewed, or treated, as above the law.

Further, Jindra's crimes presented considerable danger to the community.  He was an addict carrying a gun abusing the tremendous authority that came with his badge.  The danger he presented was especially apparent in the traffic stop that occurred on October 13, 2019 after a group of young African American men rolled through a stop sign.  The squad video and BWC show Jindra repeatedly shouting at the driver through his squad car's microphone, approaching the car with his gun drawn and slamming the driver to the ground while the driver tried to put his phone in his pocket as he exited the car at Jindra's demand.  (*See* Govt. Exs. 103, 104.)  Jindra's unnecessarily aggressive and escalating behavior in that incident could easily have resulted in tragedy.  Fortunately, it did not.

C.   <u>Specific Deterrence and the Need to Protect the Public from Crimes of the Defendant</u>

Prior to the eve of sentencing, Jindra adamantly refused to accept responsibility for his crimes.  Though he did not testify, his defense at trial vigorously contested his guilt during the 10-day trial.   In fact, he even offered the testimony of a drug recognition expert to convey that he did not exhibit any of the symptoms of a person addicted to prescription medication or other drugs.  Now, at the eleventh hour, in an attempt to elicit sympathy and mitigation at sentencing, Jindra acknowledges not only that he struggled with chemical dependency, including abuse of prescription medication and alcohol, before, during, and after the period in which he is accused of stealing drugs for his own use, but also that he in fact stole drugs from members of the community during his employment as a police officer. Only now that it may assist him in obtaining leniency from the Court does Jindra admit what the jury concluded months ago – that he stole drugs from members of the public by deceiving his partners and the MPD while he was employed as a Minneapolis police officer.   The Court should give little or no weight to Jindra's conveniently timed expressions of contrition.   It is no coincidence that Jindra only admits the conduct underlying the crimes of which he was convicted.

## V.   CONCLUSION

After consideration of all of the relevant facts and circumstances described and balancing the sentencing factors set forth in Section 3553(a), the United States recommends

that the Court impose a sentence of 41 months of imprisonment in this case followed by an

appropriate term of supervised release.

Dated:  April 28, 2022                                  Respectfully submitted,

                                                       ANDREW M. LUGER
                                                       United States Attorney

                                                       ***s/ Michelle E. Jones***
                                                       BY:  MICHELLE E. JONES
                                                       Assistant U.S. Attorney